***********
Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to receive further evidence or to rehear the parties or their representatives, the Full Commission affirms with modifications the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties in a Pre-Trial Agreement and at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The Industrial Commission has jurisdiction over the subject matter of this case, the parties are properly before the Commission, and the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act at all relevant times.
2. Am Comp Assurance Company was the carrier on the risk at all relevant times.
3. The employee-employer relationship existed between the parties at all relevant times.
4. Plaintiff's average weekly wage was $649.46, which yields a weekly compensation rate of $432.99, based upon the Form 22.
5. The parties stipulated to medical, laboratory and prescription reports, which were properly introduced into evidence.
 ***********
Based on the foregoing stipulations and the evidence presented, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the deputy commissioner, plaintiff was fifty years old and a high school graduate. Plaintiff was employed as a truck driver for defendant-employer, Rainbow Transport, and had a Commercial Driver's License. Defendant-employer owns 62 trucks, which haul trash from BFI and Waste Management to various sites. Plaintiff's duties included driving a truck to transport garbage primarily from a waste management facility in East Spencer, North Carolina to various locations across the Piedmont area of North Carolina. He was paid $40.00 per load, and would transport three to four loads per day, five days a week.
2. Plaintiff had pre-existing hypertension, diabetes, obesity, and hyperlipidemia.
3. As of 1 March 2001, Dr. J. Kerry Collins of Northwest Medical Partners began treating plaintiff for a past history of diabetes, hypertension and depression. Dr. Collins noted lab work was needed and plaintiff was not keeping a close watch on his blood sugar, only checking it once a week. Plaintiff reported his blood sugar was around 200. Plaintiff admitted he had been told to lose weight but had not done so, as he weighed 370 pounds at the exam. Plaintiff's pulse rate was 80 beats per minute. Dr. Collins diagnosed plaintiff with diabetes, hypertension, hypercholesterolomia and depression for which various medications were continued. Additional testing was ordered.
4. On 13 March 2001, plaintiff returned for follow-up treatment with Dr. Collins. Plaintiff declined medication for his high cholesterol and diabetes, preferring to control levels with diet and exercise. He also had cellulitis of the right big toe due to wearing poorly fitting shoes.
5. By 24 June 2001, Dr. Nelson Gardner of Northwest Medical Partners began treating plaintiff and noted that plaintiff was not taking medications. Plaintiff was up to 376 pounds and his pulse was 100 beats per minute. Dr. Gardner found plaintiff's diabetes and hypertension under poor control. New medications were ordered.
6. On 1 October 2001, plaintiff returned to Dr. Gardner after losing 16 pounds. Dr. Gardner recommended continued diet and exercise, as well as medications.
7. On 29 April 2002, plaintiff returned to Dr. Gardner, who found that plaintiff weighed 375 pounds; his pulse was 80 beats per minute; and his hypertension and diabetes were in poor control.
8. Each summer, Rainbow Transport's owner, Arlie Snyder, instructed his employees in mandatory safety meetings to take days off and to drink water while working outside. This was a standard part of the summer safety meetings.
9. On 12 August 2002, Rainbow Transport's mechanic, Brannon Ballard, replaced a trianary switch in truck #74's air conditioner unit. The trianary switch is in the air conditioner unit and is not a switch the truck driver can operate. After Mr. Ballard replaced the trianary switch and recharged the system's freon, he tested the air conditioner's operating temperature and found it to be at 40° F.
10. On 22 August 2002, plaintiff was driving truck #74 from the East Spencer facility to the Kernersville landfill. The high temperature in Salisbury on 22 August 2002 was 92° F.
11. In the early afternoon on 22 August 2002, plaintiff returned to East Spencer for his third load. He stopped in the parking lot to loosen the straps and roll-up the tarp from the trailer. He pulled his truck into the pit, which is the lower area beneath the floor where the trash is dumped. Plaintiff climbed steps to the upper level, where he sat down to wait for his truck to be loaded.
12. Waste Management employees used front-end loaders to load the truck, which takes approximately 20 minutes. On 22 August 2002, Waste Management facility manager Scott Moore had to load the trucks because he was short-staffed. The front-end loader was not air conditioned and after loading half of plaintiff's trailer, Mr. Moore offered to pay for cold drinks if plaintiff would go get them, as he was thirsty from loading trucks. Plaintiff then walked to the drink machine, a distance of approximately 100 yards from the trash floor, where he purchased two drinks.
13. After plaintiff returned, Mr. Moore sat down to speak with him and drink his beverage. He noticed plaintiff acting strangely, like he was intoxicated. Then, plaintiff spilled his drink over his shirt and began laughing.
14. Mr. Moore got Darren Corn for assistance, as Mr. Corn was a trained first responder. Mr. Moore said plaintiff was acting crazy and talking out of his head. Mr. Corn took plaintiff's pulse, which was 100 beats per minute. He observed plaintiff to have glazed eyes, flushed face, and he was sweating. Mr. Corn took plaintiff to the air-conditioned office and gave him wet towels. His pulse was then 85 beats per minute. Mr. Corn offered to take plaintiff to the hospital, but plaintiff declined.
15. Mr. Corn drove plaintiff to Mount Airy. During the trip, plaintiff's speech improved. Around 4:00 p.m., Mr. Corn returned to the East Spencer facility. Another driver took truck #74 to Kernersville to dump the load. On 22 August 2002, no one, including plaintiff, complained of the air conditioner not working in truck #74.
16. Plaintiff was admitted at Northern Hospital of Surry County on 22 August 2002 at 5:32 p.m. for complaints of weakness, paresthesias and impaired speech. Plaintiff had a temperature of 96.4° F, pulse of 84 bpm, and blood pressure of 166/76. Plaintiff was diagnosed with acute thrombosis cerebrovascular accident (CVA), right parietal; expressive dysphagia secondary to CVA; poorly controlled diabetes, hypertension, and hyperlipoproteinemia, as well as a diabetic foot ulcer.
17. As plaintiff's speech was impaired at the hospital, his wife reported to Dr. Gardner that plaintiff was unloading a truck in Spencer when he developed left arm tingling. Based upon this inaccurate history of physical activity, Dr. Gardner erroneously assumed plaintiff was engaged in physical activity unloading a truck for 20-30 minutes, rather than sitting by while someone used a front-end loader to fill his truck.
18. On 23 August 2002, Mr. Corn drove truck #74 and found the air conditioner functioning normally.
19. On 28 August 2002, Dr. Gardner saw plaintiff after he was released from the hospital. Plaintiff had lost ten pounds and his blood pressure and sugar levels were good. Plaintiff complained of headaches, blurred vision and tingling on the left side. Dr. Gardner stopped the Actose for diabetes and ordered an MRI or CT scan. The MRI revealed narrowing in cerebral artery, consistent with high cholesterol, which was not being regulated. Due to plaintiff's hypertensive response after a treadmill test, Dr. Gardner recommended being more aggressive with his anti-hypertensive regimen, increasing doses of calcium channel blocks and Ace inhibitor.
20. At the hearing before the deputy commissioner, plaintiff contended the air conditioner was not blowing cold air and that was the cause of his stroke on 22 August 2002.
21. On 6 September 2002, Mr. Ballard rechecked the air conditioner in truck #74 and found it operating at 40° F.
22. On 24 September 2002, neurologist Dr. John G. Malone evaluated plaintiff for left hemisphere stroke, left arm pain and numbness. Dr. Malone noted plaintiff was morbidly obese and had diabetes. By 7 October 2002, Dr. Malone determined plaintiff's left arm symptoms were due to cubital and carpal tunnel syndrome.
23. On 28 October 2002, plaintiff's weight was back up to 362 pounds. Dr. Gardner ordered aggressive therapy for his speech, balance and comprehension problems.
24. On 24 April 2003, plaintiff returned to Dr. Malone and reported that exposure to intense heat prompted his stroke. However, there is no competent evidence to support plaintiff's conjecture. The evidence presented does not support a finding that plaintiff suffered from heat stroke or injury from extreme heat exposure. In addition, the competent evidence in the record supports a finding that the air conditioner in truck #74 was functioning and cooling properly on 22 August 2002. No weight is given to plaintiff's testimony to the contrary.
25. Board Certified Neurologist and professor at Wake Forest School of Medicine, Dr. Peter Donofrio, reviewed plaintiff's medical records and testing, following which he found plaintiff's hypertension, hyperlipidemia, obesity, diabetes, elevated triglycerides and probably obstructive sleep apnea contributed to his stroke. Greater weight is given to the opinion of Dr. Donofrio over any other contrary opinions.
26. Based on the greater weight of the evidence, plaintiff was not at an increased risk of suffering a stroke due to his employment. Further, there is insufficient evidence that plaintiff's stroke was characteristic of or peculiar to his employment as a truck driver.
27. Dr. Malone, who is board-certified in neurology, clinical neurophysiology and sleep medicine, opined that plaintiff would never be able to return to work full-time. He noted that on 22 August 2002, plaintiff had several risk factors for stroke including high blood pressure, high cholesterol, diabetes and obesity. He further testified that higher temperatures prompt dehydration, salt wasting, mental fatigue and cognitive changes. However, heat does not directly precipitate a stroke. Prior to April 2003, Dr. Malone had never considered heat to be a factor in plaintiff's stroke.
28. Dr. Gardner was provided written weather information in response to which he wrote an opinion letter relating plaintiff's stroke to heat. In a 4 June 2003 opinion letter, Dr. Gardner wrote that plaintiff's exposure to the high temperature played a "participating factor in the left middle cerebral artery CVA." However, this opinion was based upon an inaccurate history of plaintiff's physical activity prior to onset of the symptoms. When given a correct history of onset, he gave the opinion that it was possible for a diabetic like plaintiff to be more sensitive to heat and thereby at an increased risk of sustaining a stroke.
29. Based on the greater weight of the evidence, plaintiff's employment did not subject him to a greater hazard or risk of heat stroke or a heat-related injury than that to which he would have otherwise been exposed if he did not drive a truck for defendant-employer and extreme heat exposure did not cause plaintiff's stroke on 22 August 2002. Therefore, plaintiff did not suffer an injury by accident arising out of and in the course of his employment on 22 August 2002.
 ***********
Based upon the foregoing Stipulations and Findings of Fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Plaintiff has failed to prove that he suffered an injury by accident arising out of and in the course of his employment. N.C. Gen. Stat. § 97-2(6).
2. Where the exact nature and probable genesis of a particular injury involves complicated medical questions removed from the ordinary experience of the layperson, only a qualified expert witness can give an opinion as to the nature and cause of the injury. Click v. Pilot FreightCarriers, Inc., 300 N.C. 164, 265 S.E.2d 389 (1980). The Commission must first determine whether the proffered expert opinion is competent before the opinion can be weighed as evidence in the case. Expert opinion that rests on speculation and conjecture, or unproven facts, is not sufficiently reliable to qualify as competent evidence concerning the nature and cause of the injury. Young v. Hickory Business Furniture,353 N.C. 277, 538 S.E.2d 912 (2000). In the instant case, Dr. Gardner's original opinion testimony was based on an inaccurate history of onset given to him by plaintiff's wife that plaintiff's symptoms began after he unloaded a truck. When Dr. Gardner was given an accurate history, he changed his opinion and stated it was possible that plaintiff's exposure to heat increased his risk of sustaining a stroke. Dr. Gardner's opinion is insufficient to establish a causal relationship between plaintiff's employment and his stroke.
3. In order to qualify for compensation under the Workers' Compensation Act, a claimant must prove both the existence and extent of disability.Hilliard v. Apex Cabinet Co., 305 N.C. 593, 290 S.E.2d 682 (1982). Plaintiff has failed to prove by competent evidence that he is entitled to temporary total disability benefits as a result of his stroke.
 ***********
Based upon the foregoing Findings of Fact and Conclusions of Law, the Full Commission enters the following:
 AWARD
1. Plaintiff's claim is, and under the law must be, DENIED.
2. Each side shall pay its own costs.
IT IS ORDERED that plaintiff's motion during oral argument before the Full Commission to reopen the record and admit additional evidence is DENIED.
This the ___ day of January 2005.
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/_____________ THOMAS J. BOLCH COMMISSIONER
 S/_______________ DIANNE C. SELLERS COMMISSIONER